**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAMES RAY EPPS, SR.,          ) | |
|        ) | |
|       Plaintiff,     ) | |
|        ) | |
|     v.        ) | C.A. No. 23-761-JLH |
|        ) | |
| FOX NEWS NETWORK, LLC,    ) | |
|        ) | |
|      Defendant.    ) | |
|        ) | |

**<u>MEMORANDUM OPINION</u>**

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Michael J. Teter, TETER LEGAL, Salt Lake City, Utah; Dick J. Baldwin, PARR BROWN, Salt Lake City, Utah.

    *Attorneys for Plaintiff*

John L. Reed, Peter H. Kyle, DLA PIPER LLP (US), Wilmington, Delaware; Patrick F. Philbin, Kyle T. West, TORRIDON LAW PLLC, Washington, D.C.

    *Attorneys for Defendant*

Wilmington, Delaware
May 8, 2026

**JENNIFER L. HALL, U.S. DISTRICT JUDGE**

Pending before the Court in this defamation case is Defendant Fox News Network, LLC's Motion to Dismiss the Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) for Failure to State a Claim.  (D.I. 35.)  I previously granted Fox's motion to dismiss the original Complaint and granted Plaintiff James Ray Epps, Sr., leave to amend.  (D.I. 28, 29, 32.)  Epps then filed the operative Amended Complaint.  (D.I. 33 ("AC").)  For the reasons explained below, I conclude that the AC fails to state a plausible claim and should be dismissed.

## I.   BACKGROUND

This case arises from statements made by former Fox News host Tucker Carlson about the events at the United States Capitol on January 6, 2021.  I write primarily for the parties and assume familiarity with the Court's prior ruling[1] and the allegations in the AC.  I will elaborate on additional details alleged in the AC where relevant to the Court's analysis.  In brief, the AC alleges the following, which the Court must take as true for purposes of ruling on the motion to dismiss.

Until April 2023, Tucker Carlson was a Fox News personality and host of the Fox News show *Tucker Carlson Tonight* ("TCT").  (AC ¶ 24.)  Plaintiff Epps, a former Marine and resident of Utah during the relevant time, was a supporter of President Donald Trump and "an avid and loyal Fox viewer and a fan of Mr. Carlson's."  (*Id.* ¶¶ 22, 27.)  Believing that the 2020 Presidential election "had been stolen," Epps and his son traveled to Washington, D.C., in early January 2021 to "let their views be known."  (*Id.* ¶¶ 27–30.)

On the evening of January 5, 2021, Epps attempted to deescalate a confrontation between police and "highly agitated" Trump supporters.  (*Id.* ¶ 31.)  In an attempt "to find common ground," Epps told the crowd that "I'm probably gonna go to jail for this.  Tomorrow, we need to go into

---

[1] *Epps v. Fox News Network, LLC*, No. 23-761, 2025 WL 2205982 (D. Del. Nov. 27, 2024).

the Capitol. Peacefully." (*Id.* ¶ 32.) At the time, Epps thought that the Capitol Rotunda would be open to the public. (*Id.*) Members of the crowd responded to Epps's suggestion that they enter the Capitol by chanting "Fed, fed, fed." (*Id.*) Unbeknownst to Epps, the encounter was filmed and livestreamed on the internet. (*Id.*)

The next morning, January 6, 2021, Epps attended a rally at the Ellipse and was present for President Trump's speech. (*Id.* ¶ 33.) While there, Epps "learned that the crowd planned to march to the Capitol." (*Id.*) "Believing that the time had come to protest the election results at the Capitol where the results were about to be certified by Congress, Epps and others began directing people towards the Capitol." (*Id.*) Arriving at the Capitol, Epps "made his way to the barricades separating protesters from police" and "sought to diffuse the situation." (*Id.* ¶ 34.)

Video from that day "shows Epps speaking with a protester named Ryan Samsel at the first barricade, just before Mr. Samsel helped to breach it." (*Id.* ¶ 35.) According to the AC, when the FBI interviewed Samsel in 2021, he stated that Epps told him, "Relax, the cops are doing their job." (*Id.*) Subsequently, according to the AC, Samsel changed his story, "falsely claiming that Epps instructed him about how to push through the barricades." (*Id.* ¶ 36.)

Epps continued to try to diffuse the situation even as the crowd pushed past the barricade and toward the Capitol. (*Id.* ¶¶ 37–38.) Epps asked police officers whether protesters could stand on a step below the police line, and after police confirmed that they could, Epps "patrolled that line, telling anyone who stepped up, to step back." (*Id.* ¶ 38.) Epps told the protesters to be respectful of the police and was captured on bodycam video telling the police that he appreciated them. (*Id.*)

At one point, a protester had a medical emergency and Epps rushed to help. (*Id.* ¶ 39.) Once the protester was safe, "Epps looked back at the Capitol and saw people advancing and

3

climbing the scaffolding and walls." (*Id.*)  Epps "was shocked and disappointed" because "he did not believe violence was appropriate." (*Id.*)  Epps then left the Capitol and walked back to his hotel. (*Id.*)

After Epps flew home, he was informed that "the FBI's website had posted a photograph of Epps, indicating that it was seeking information about him." (*Id.* ¶ 40.)  "Within minutes, Epps was on the phone with the FBI, providing his name and information." (*Id.*)  Epps retained an attorney and cooperated with the FBI. (*Id.*)  Epps's photograph was removed from the FBI website in July 2021. (*Id.*)  Epps was then interviewed by the United States House Select Committee on the January 6th Attack on the United States Capitol (the "Committee"), and the Committee put out a statement asserting that Epps was not a federal agent. (*Id.* ¶ 44.)

Beginning in December 2021, Carlson began discussing Epps and the Committee. (*Id.* ¶¶ 45–47.)  Relevant here, the AC alleges claims for "defamation per se" and "false light" based on certain statements made by Carlson and his guests in broadcasts between July 14, 2022 and March 11, 2023.[2]  Transcripts of the challenged TCT broadcasts are attached as exhibits to the AC (AC Exs. B, C, D), and the parties don't dispute that the transcripts are accurate.

### A.    July 14, 2022 TCT Segment

On July 14, 2022, Fox News broadcast a TCT segment with guest Darren Beattie. (AC ¶ 55; *id.* Ex. B.)  According to the AC, "Beattie was the principal person driving the false story that

---

[2] The AC also describes statements made on a July 13, 2022 TCT broadcast. (AC ¶ 53.) In Fox's opening brief in support of its motion to dismiss, Fox contended that claims based on the July 13, 2022 broadcast should be dismissed as time-barred because they were asserted for the first time in the AC, past the 1-year statute of limitations period. (D.I. 36 at 22.)  Epps's answering brief did not address the argument.  Epps has therefore forfeited any argument based on the July 13, 2022 broadcast. *Morrison v. Nemours Found.*, No. 22-1576, 2025 WL 219583, at *2 (D. Del. Jan. 16, 2025) (arguments omitted from briefs are forfeited).  Even if Epps hadn't forfeited the position, I agree with Fox that claims based on the July 13, 2022 broadcast in the AC do not relate back to the initial complaint and are thus time-barred.

Epps was a federal agent planted as a provocateur to trigger the Capitol violence on January 6th"

and that Beattie "advanced this theory on his own conspiracy website, *Revolver*." (*Id.* ¶ 55.)

Before introducing Beattie, Carlson engaged in a lengthy discussion of a recent New York

Times article and video discussing Epps. (AC Ex. B at 5–8.) Carlson played video clips of Epps

at the Capitol, and Carlson observed that others had been federally charged for similar acts but

Epps hadn't been. (*Id.*) Carlson then stated, "we've asked Ray Epps on the show repeatedly to

explain why he thinks he has escaped prosecution, and we'll ask him once again tonight, and we

will keep asking, because we think it is a very obvious and important question that gets to the heart

of what is this exactly." (*Id.* at 6–7.)

Beattie and Carlson then had the following conversation:

> TUCKER CARLSON (HOST): Darren Beattie is one of the reasons this piece was first written. He's the editor of Revolver News, which published the first stories about Ray Epps. Obviously, The New York Times is very worried about his reporting. We're happy to have him join us tonight. Darren, thanks so much for coming on. What do you make of this?
>
> DARREN BEATTIE (GUEST): Well, it's pretty remarkable. I mean, just let's take all of this in. The one person caught repeatedly urging people into the Capitol as early as January 5th is the one person of all of the January 6th riot participants that The New York Times just happens to write this ultra sympathetic puff piece for. It's—it's quite remarkable.
>
> And to look at the piece itself. As you suggested in your—in your intro, there are some real glaring omissions from a journalistic standpoint to have access to this guy. Number one, in the entire piece, there is no blanket explicit denial on the part of Epps to have been associated with any intelligence group—DHS, JTTF, military intelligence, so forth; just reiterates his very legal denial of being involved with law—law enforcement.
>
> Number two, the piece describes Epps as a Trump supporter. He just went to [] D.C. to defend Trump and to attend the speech on a last-minute thing with his son—to attend Trump's speech on election fraud. The only thing is Epps didn't attend the speech.

Epps travels all the way from Arizona to D.C., this big Trump supporter, and he doesn't even attend the speech. Instead, he fixates on this bizarre mission to get everyone to go into the Capitol. And by the way, he just happens to be hanging out right by the initial breach point near the Peace Monument on the west side of the Capitol before the Proud Boys even get there.

And thirdly, where did Ray Epps get this idea? This whole piece doesn't explore that question at all. Here is the one person calling for everyone to go in. Where did you get that idea, Ray Epps? Did it occur to you out of nowhere did someone tell you to do it? This piece, shockingly, does not explore that question at all, which is the paramount question that's really the animating—the alleged animating focus of the January 6 committee.

So this is so dirty. Ray Epps' behavior was so egregious that he was one of the first 20 on the FBI's most wanted list. He was featured as a star in The New York Times' own documentary on January 6. And now he's unarrested, unindicted, and he's the only January 6 rioter about whom Adam Kinzinger has nice things to say, and The New York Times is writing puff pieces about.

He's the smoking gun of the entire fed-surrection.

CARLSON: And they go crazy when you ask simple questions like, what was the role of federal law enforcement or the military in this day? And it's been our experience that when they won't answer a question and call you names for asking it, maybe there's something there. I appreciate your pulling this thread relentlessly, Darren Beattie. Thank you.

(AC ¶ 55.) The AC alleges that "[a]verage viewers of this broadcast understood the 'gist and sting' of the broadcast, considered in its entirety, as communicating as a fact that Epps was a federal agent planted to encourage supporters of Donald Trump to go into the Capitol building on January 6th—the core false and defamatory allegation upon which this Complaint by Epps against Fox is predicated." (*Id.* ¶ 56.)

6

**B.      January 6, 2023 TCT Segment**

The next challenged segment occurred on the January 6, 2023 TCT broadcast.  The AC

alleges that TCT broadcast the following graphic displaying "FedEpps" in the familiar FedEx font

and tone:



(*Id.* ¶ 57.)  Carlson stated the following during the broadcast:

> Nor does anyone in authority want to talk about Ray Epps.  Ray
> Epps, of course, is the man who was caught on tape encouraging the
> crowd outside the Capitol both on January 5th and 6th to commit
> felonies by rushing inside.  Now what's interesting is that the
> January 6th Committee under public pressure did in the end
> interview Ray Epps.  Now we don't have all of the Committee[']s
> records about that interview.  We should, but we don't.  But some
> have been released and what they tell is a remarkable story.  In the
> testimony we have, the Committee coaches Ray Epps on how to
> answer questions about his involvement.  Quote, I was in the front
> with a few others.  I also orchestrated it.  I helped get people there.
> End quote.  Now Epps admitted that in a text message to a relative
> on January 6th.  He's admitting crimes.  He's never been even
> charged for those crimes, but what's so fascinating is that when
> those facts came up in his interview with the Committee, someone
> on the Committee responds this way—and we're quoting: "I just
> want to understand a little more your use of the word orchestrated.
> It sounds to me like at this point when you sent this text you had
> turned away in part because of seeing some things that you didn't
> agree with.  Is that right?  Like when you sent this you were already
> on your way from the Capitol because of concerns of people taking
> it in a different direction?" [Fake laughter] Is that the most leading
> question ever asked in the history of a congressional hearing?

7

> Probably.  And the whole interview goes on like this.  Keep in mind Ray Epps is one of the only people caught on camera that day encouraging others to break the law.  He's one of the only ones.  And yet he's never been charged and the January 6th Committee was on his side.  Why was the Committee and its members working so hard to help Ray Epps?  Now, in his interview with the Committee, Ray Epps said he didn't work for law enforcement.  Law enforcement in a very specifically worded answer clearly thought through ahead of time.  The question is, did Ray Epps work or have any contact with any government agency?  Did he talk about January 6th before it happened with any employee of the U.S. government?  We don't know.  We do know that two years after January 6th, long after an awful lot of other people have gone to jail for walking around the Capitol building, Ray Epps is still a free man.  He's never been charged, much less imprisoned in solitary confinement like so many others.  Why is that?  Well, let's just stop lying.  At this point, it's pretty obvious why that is.  But, of course, they're still lying about it.

(*Id.* ¶ 58; *id.* Ex. C.)  The AC alleges that "[a]verage viewers of this broadcast understood the 'gist and sting' of the broadcast, including the image of Epps, considered in its entirety, as communicating as a fact that Epps was a federal agent planted to encourage supporters of Donald Trump to go into the Capitol building on January 6." (AC ¶ 59.)  The AC further alleges that "Mr. Carlson also falsely claimed that Epps was encouraging others on January 6th to storm the Capitol, and used imagery on screen of Epps talking to Ryan Samsel, who had informed authorities that Epps tried to calm him down and told him, 'Relax, the cops are doing their job.'" (*Id.*)

### C.    March 6, 2023 TCT Segment

The next challenged segment aired on March 6, 2023, with Congressman Thomas Massie as Carlson's guest.  (*Id.* ¶ 60; *id.* Ex. D.)  Before introducing Representative Massie, Carlson stated the following:

> The January 6 Committee had access to this very same tape and watched much of it.  But as we're about to show you, Committee members lied about what they saw and then hid the evidence from the public, as well as from January 6 criminal defendants and their lawyers.  That is unforgivable.

8

> Whatever you think of Speaker Kevin McCarthy, he rectified that crime, and we are grateful that he did. Before we show you the tape, a few words on the process. Our producers had unfettered access to the Capitol surveillance video. Neither the Speaker's Office nor our bosses at FOX News interfered in any way with our investigation.
>
> Of the 40,000 or so hours of tape, most of it turned out to be irrelevant - - static shots of empty rooms, in some cases far from the Capitol itself. To find relevant videotape, our producers were given use of Capitol computers with advanced mapping software. That made it easy to find what we were looking for. What we didn't have was access to facial recognition software, and that was significant.
>
> For more than two years, we have wondered why some in the crowd that day who seemed to be inciting violence were never indicted for it. We assumed these were Federal agents of some sort. We still assume that.
>
> And in fact, there were many examples of behavior we saw in those tapes that didn't seem to make sense: Men in civilian clothes holding doors open for protesters, escorting others through the Capitol, et cetera. We would love to know who these people were, but as of tonight, we don't know and because we don't know, we're not going to put their faces on the screen and suggest they were Federal agents. That would be irresponsible.

(AC ¶ 61.) Carlson displayed a series of video clips from Capitol surveillance cameras and the Committee hearings. (*Id.* Ex. D at 1–14.) At one point, Carlson stated that the surveillance footage showed that Epps was still present near the Capitol after he had told the Committee he had gone back to his hotel. (*Id.* at 12.) Carlson stated "[t]he surveillance footage we found shows that in fact, Ray Epps remained at the capitol for at least another half an hour. You're seeing that on your screen now." (*Id.*)

Representative Massie then joined the broadcast, and had the following discussion with Carlson:

> MASSIE: Let's watch the videos and let's see what they did, because there are some really strange behavior on those videos of people behind the police lines in plain clothes, like touching them on the shoulder, talking in their ear, walking up around boundaries,

9

as if they weren't even there.  It's very odd.  I'm the one who asked Merrick Garland, I showed him the tape of Ray Epps.  The Democrats didn't like it.  I had to show it on an iPad for Merrick Garland to watch it and then he refused to say how many Feds were there.  But that was also in the Rasmussen poll, 57 percent of Democrats think that it is at least somewhat likely that Feds, agents of the Federal government, were not just there, but were also encouraging people to riot or go into the Capitol.

CARLSON: It's very clear from the footage that our producers bravely slogged through for three weeks and God bless them for doing it that that's exactly right.  That Federal agents encouraged the violence that day.  We are just a TV show and we can't show people without proof of who they really were, but I agree with your assessment completely.

MASSIE: Right.

CARLSON: That obviously happened.  Congressman Thomas Massie of Kentucky, thank you so much for coming on.  Appreciate it.

MASSIE: Thanks, Tucker for getting this out there.

CARLSON: Of course.

(AC ¶ 60; *id.* Ex. D. at 15–16.)  The AC alleges that "[b]y stating that he would not show the faces of those he was uncertain about, average viewers of this broadcast would understand Mr. Carlson's 'gist and sting' to be asserting a fact about Epps: that he was a federal agent who incited the January 6th insurrection."  (AC ¶ 62.)

### D.    March 11, 2023 Segment on *Redacted* Podcast

The final challenged segment occurred during Carlson's guest appearance on the *Redacted* podcast on March 11, 2023.  (*Id.* ¶ 63.)  The AC alleges that Carlson stated:

A lot of this was clearly influenced by federal agents or informants. It was, ok?  But I did not want to suggest someone was a federal agent or informant unless I knew for a fact because you really could get someone in trouble.  Right?  If you're like, this was the guy, and like, we don't know.  I do know for, I mean it's very clear, something very strange is going on with Ray Epps, we've named him repeatedly, we've invited him on the show repeatedly.  I mean

10

> don't lie to my face, the Ray Epps thing isn't, isn't organic, sorry…
> Ray Epps clearly was working for somebody.  He was not a pure
> civilian.

(*Id.*)

### E.   Procedural History and Subsequent Events

Epps sued Fox News Network, LLC (hereinafter, "Fox") in Delaware Superior Court on July 10, 2023.  (D.I. 1 Ex. A.)  Fox removed the case to this Court (D.I. 1) and moved to dismiss the original Complaint for failure to state a claim (D.I. 11).  The Court granted the motion to dismiss the original Complaint on November 27, 2024, concluding (1) that Epps's claims were subject to Utah's 1-year statute of limitations (D.I. 48 at 4–7); (2) that the Complaint didn't plead facts plausibly suggesting that Fox is responsible for Carlson's statements on the *Redacted* podcast (*id.* at 7); and (3) that the Complaint failed to allege facts plausibly suggesting that Fox acted with actual malice (*id.* at 11–15).  The Court granted Epps leave to amend, which he did on December 27, 2024.  (D.I. 33.)  Count One of the AC asserts a claim for "defamation per se." (*Id.* at 59–64.) Count Two asserts a claim for "false light." (*Id.* at 64–66.)  Fox moved to dismiss both claims. (D.I. 35.)

Meanwhile, in September 2023, Epps was charged in federal court with one count of Disorderly or Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2).  (D.I. 37 Ex. 3.)  The charges related to Epps's conduct on January 6, 2021.  Epps pleaded guilty.  (*Id.* Ex. 4 at 14.)  Public records suggest that Epps was later pardoned by President Trump.  *See* Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021, 90 Fed. Reg. 8331, 8331, 2025 WL 315838 (Jan. 20, 2025) (granting "a full, complete and unconditional pardon to all other

individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021").[3]

## II.     LEGAL STANDARD

A defendant may move to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  A possibility of relief is not enough.  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  In determining the sufficiency of the complaint, the court must assume all "well-pleaded facts" are true but need not assume the truth of legal conclusions.  *Id.* at 679.  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Twombly*, 550 U.S. at 558 (internal quotation marks omitted).

## III.    DISCUSSION

Fox advances two primary arguments about why the AC fails to state a claim.  First, Fox argues that the AC fails to allege sufficient facts plausibly suggesting that Fox acted with the requisite level of fault, which is "actual malice."   Second, Fox argues that the challenged

---

[3] The Court takes judicial notice of the public records discussed in this paragraph.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

statements are non-actionable because they are protected opinions based on disclosed facts. Because I agree with Fox's first argument, I do not address the second.

In assessing whether the AC plausibly alleges actual malice, I make two critical assumptions in Epps's favor. First, I assume that a reasonable viewer of TCT understood Carlson's statements to mean what the AC says they meant, notwithstanding that Carlson never actually said those words.[4] Second, I assume that falsely stating that someone is a government informant could be defamatory, notwithstanding that every American court to consider the issue has concluded otherwise.[5]

Thankfully, the parties agree on a few issues. Epps says that Utah law applies to his claims, and Fox doesn't dispute that the Court may assume that Utah law applies for purposes of assessing the motion to dismiss. (D.I. 36 at 2.) Fox says that, because Epps is a public figure, the AC must plausibly allege actual malice. And Epps agrees that both of his claims require actual malice. (D.I.

---

[4] Epps's brief repeatedly asserts that Fox stated that it was a fact that Ray Epps was a federal agent who incited the January 6 insurrection. (D.I. 43 at 1 ("Fox told its viewers that Ray was a federal agent who incited the January 6 insurrection, and it did so intentionally, telling them that it was a fact."), 16 ("Fox directly told its viewers that Ray was a federal agent as part of its larger message that the January 6 attack was a false flag operation by the FBI.").) Having reviewed the transcripts of the relevant broadcasts in their entirety, the Court has not found any statement by Carlson or anyone else stating that it was a fact that Ray Epps was a federal agent who incited the January 6 insurrection.

[5] *See Agnant v. Shakur*, 30 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) ("This court is not the first to face the issue of whether falsely accusing one of acting as an informant can be defamatory. So far as I can tell, every other court to have considered the question, save one, has held, as a matter of law, that such a statement cannot be defamatory, the sole exception being the Scottish court in the nineteenth-century[.]" (collecting cases)); *see also, e.g., Michtavi v. N.Y. Daily News*, 587 F.3d 551, 552 (2d Cir. 2009); *Sanguedolce v. Wolfe*, 62 A.3d 810, 813 (N.H. 2013) (collecting cases); *Clawson v. St. Louis Post-Dispatch, L.L.C.*, 906 A.2d 308, 314–17 (D.C. 2006) (holding that statements that the plaintiff was an "informer" or an "FBI informer" are not defamatory as a matter of law); *Andrews v. Stallings*, 892 P.2d 611, 624 (N.M. Ct. App. 1995).

13

47 at 43.)  The parties also agree that the Court may rely on (1) the exhibits attached to and incorporated in the AC, and (2) the full transcripts of the challenged broadcasts.

The Court will first address the AC's allegations pertaining to actual malice.  The Court then addresses Fox's additional argument regarding Carlson's March 11, 2023 statement on the *Redacted* podcast.

### A.    Actual Malice

Both of Epps's claims arise under state law.  But the First and Fourteenth Amendments prevent states from imposing defamation liability in actions brought by public figures unless the plaintiff can establish that the defendant acted with the requisite degree of fault.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 283 (1964).  This rule is rooted in this Nation's history of robust speech and debate on issues of public importance.  *Id.* at 269–71, 279–80.  And while the rule can sometimes operate to deny a plaintiff relief for harm suffered as the result of an indisputably false statement, the Supreme Court has explained that "to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones."  *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

If the plaintiff is a public figure, he must show that the challenged statements were published with "actual malice."  *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020).  "Actual malice" is a term of art that requires a plaintiff to show that the publisher of the challenged statements knew that the statements were false or published the statements with reckless disregard for their truth.  *Id.*  Utah courts apply this federal standard.  *O'Connor v. Burningham*, 165 P.3d 1214, 1218 (Utah 2007); *see also West v. Thomson Newspapers*, 872 P.2d 999, 1007 (Utah 1994) ("The First Amendment creates a broad, uniform 'floor' or minimum level of protection that state law must respect.").

Although a plaintiff may rely on circumstantial evidence to show actual malice, *McCafferty*, 955 F.3d at 359, there "must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," *St. Amant*, 390 U.S. at 731, "or was highly aware that the account was probably false," *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016). Where the defamation defendant is an organization, "the state of mind required for actual malice would have to be brought home to the persons in the [defendant's] organization having responsibility for the publication of the [statement]." *New York Times*, 376 U.S. at 287. In other words, "[w]hen there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) (citing *id.*).

At the pleading stage, a public figure defamation plaintiff "must allege *facts* to support an inference of actual malice." *Pace v. Baker-White*, 850 F. App'x 827, 831 & n.16 (3d Cir. 2021) (collecting cases). Epps acknowledges that he also must plausibly allege actual malice to proceed with his false light claim. (D.I. 47 at 43.) *See also Time, Inc. v. Hill*, 385 U.S. 374, 387–91 (1967).

As noted above, the Court dismissed Epps's original Complaint for failure to plausibly allege actual malice. *See Epps v. Fox News Network, LLC*, No. 23-761, 2025 WL 2205982 (D. Del. Nov. 27, 2024). The AC contains a number of new allegations that Epps says are relevant to actual malice. (D.I. 29 Ex. B (redline comparing original Complaint to AC).) I note at the outset that many of the new allegations are conclusory statements and/or legal assertions that the Court need not credit when assessing whether the complaint states a plausible claim for relief. *Iqbal*, 556 U.S. at 664. That said, the AC does allege some additional facts. I address them specifically

15

below, but the allegations for the most part relate to skepticism expressed by former Fox employees Abby Grossberg, Jason Donner, and Geraldo Rivera about certain things that were said on TCT. Plaintiff asks the Court to infer that Carlson and/or Fox knew that Carlson's statements were false because Grossberg, Donner, and Rivera thought Carlson's stories were off base.

As described in more detail below, there are two fundamental problems with Epps's argument that the additional allegations suggest actual malice. First, the AC does not allege any facts suggesting a plausible inference that Grossberg, Donner, and Rivera had reason to know that Carlson's statements about Epps were inaccurate. That is not surprising because whether Epps was in fact acting as a federal government informant on January 6 would likely have been—at the time the challenged statements were made—a confidential piece of information known only to government officials. The AC pleads no facts plausibly suggesting that any of the former Fox News employees had access to that information. Rather, Epps's actual malice allegations are primarily based on the opinions of individuals who had no more reason than Carlson to know whether Epps was a federal informant. That is not enough to proceed. *See, e.g.*, *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 25 (1st Cir. 2018) (affirming district court's dismissal of defamation complaint for failure to plausibly allege actual malice because, among other reasons, "it was not possible to get anyone at the SEC to verify or refute the existence of an investigation"); *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003) (holding that the plaintiff had not established that the defendant acted with actual malice even where the defendant was "told by the Vice Chief of Naval Operations, Admiral Stanley Arthur, and other Navy officers that [the defendant's] conclusion about [the plaintiff] was wrong" because those comments were not "evidence that could be readily verified").

16

The second major problem with Epps's position is that the AC pleads no facts plausibly suggesting that Grossberg, Donner, or Rivera were responsible for the content of TCT. Although Grossberg served on TCT's staff, nothing in the AC or the attached documents suggests that she had responsibility for the show's content. The attached documents actually suggest the opposite: that she had no responsibility for the show's content and that her suggestions were ignored. There is no suggestion that Donner or Rivera had any involvement in the content presented on TCT. Nor does the AC allege facts plausibly suggesting that Grossberg, Donner, or Rivera shared their concerns with Carlson or others responsible for TCT's content before publication.

### 1. The AC does not allege facts plausibly suggesting actual malice based on Grossberg's statements

Epps first relies on comments made by former Fox News producer Abby Grossberg. The AC quotes Grossberg's public comments, deposition testimony, and allegations in two lawsuits that Grossberg filed against Fox.[6] From September 5, 2022 to March 24, 2023, Grossberg was a Senior Producer and Head of Booking for TCT. (AC ¶¶ 87, 89, Ex. E ¶¶ 16, 225.) She was on FMLA leave from January 18, 2023 to February 27, 2023. (AC Ex. E ¶¶ 315, 326.) "As Head of Booking, Ms. Grossberg led the team responsible for guest bookings and used her extensive industry contacts to communicate with, pitch, and secure high-profile guests at the center of major news stories." (*Id.* ¶ 226.)

The AC first quotes Grossberg's allegation that Carlson instructed her to "investigate the ongoing Proud Boys trial," and that in doing so, an attorney for one Proud Boys member told Grossberg that the Proud Boys entered the Capitol on their own and that Carlson's angle was "on the conspiracy side." (AC ¶ 87, Ex. F ¶ 137.) When Grossberg informed her supervisor, she was instructed to find another guest. (AC ¶ 87, Ex. F ¶ 137.)

---

[6] Grossberg's complaints are attached to and cited in the AC. (AC Ex. E, Ex. F.)

The AC next quotes Grossberg's telling of the same occurrence in an interview.[7] Grossberg stated that

> For example, right toward the end of my time there, when the January 6th tapes were coming out, Tucker was very set on finding an FBI person who was implanted in the crowd and spinning this conspiracy that they were ultimately the ones responsible for the Capitol attack, not Fox News as they're about to go into the Dominion trial, that it was really, you know, the FBI that set up this thing, not Fox telling the American people that the election rigged and the voting machines did it . . . .
>
> [T]hat wore my mental health too because by that time, I had really begun to connect the dots that the programming that we were putting on the air every night, was not just generating business, but also generating hatred in the audience, and after January 6th, I had this wake up moment that this is hurting people, people are getting angry and people are acting out on that anger and this is not okay and I don't want to be part of that.

(AC ¶ 88.) The interviewer then asked, "I want to ask you about the tapes. I mean, did he ask you guys to look through the tapes looking for Epps, that what you're suggesting, or other FBI informants?" (*Id.*) Grossberg responded:

> I was not part of the team that look through the tapes. I, prior, my story's long, but I had been on emergency medical leave due to the abuse that took place on that show, so when I came back, they knew I had legal representation, so was not including me in the viewing of the tapes, but they were having me just look for a lawyer of a Proud Boy that was willing to say that there were FBI informants infiltrating the Proud Boys and the oath keepers.

(*Id.*)

For several reasons, the allegations about Grossberg are insufficient to plausibly suggest that Carlson acted with actual malice when he made the statements about Epps. First, the AC does not allege that Grossberg's skepticism regarding Carlson's statements was based on any actual

_____

[7] The AC provides no details regarding the interview's context, such as the date of the interview, who the interviewer was, or whether and how the interview was published.

knowledge she had about whether there were FBI informants in the crowd. Grossberg was at the time a Fox News guest booking staffer. There is no suggestion that she had access to confidential FBI information. Her comments are based on her speculation and the statement of a third-party attorney with no apparent connection to Epps. There are no facts alleged in the AC suggesting that the attorney had any basis to know whether Epps was a federal informant, or that Grossberg had any other factual basis for her statements. *See Tavoulareas v. Piro*, 817 F.2d 762, 793–94 (D.C. Cir. 1987) (*en banc*) (explaining that an editor's memorandum expressing skepticism about an article "fails to constitute acceptable evidence of actual malice" where the editor "had no knowledge of the sources or research underlying the article"); *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 87–89 (D.D.C. 2012) (rejecting argument that the defendant acted with actual malice by "ignor[ing] several editors and others who questioned the factual bases for his articles" because "the mere fact that [the editors] and defendant disagreed to some extent about the factual support for the article does not indicate actual malice").

Second, Grossberg's statements were not about Epps. Epps says that the defamatory statement is that Epps was an FBI informant, but nothing in Grossberg's comments suggests that Epps was not an FBI informant. The discussion involves the Proud Boys, but the AC does not allege that Epps was a member of the Proud Boys, and Epps testified under oath that he was formerly a member of a different organization, the Oath Keepers. (D.I. 13 Ex. E at 6–7.)[8] The attorney's statement that the Proud Boys entered the Capitol on their own accord and were not FBI informants does not reasonably suggest that a separate individual who is not a member of the Proud

---

[8] The Court refers to the transcripts of Epps's interviews with the Committee because they are public records integral to and incorporated in the AC. Epps doesn't dispute that the Court may rely on the transcripts.

Boys was not an FBI informant.  Indeed, after Grossberg recited the Proud Boys story, she was specifically asked about Epps, and she disclaimed involvement in the show's research into Epps. (AC ¶ 88.)

What's more, the AC does not allege that Grossberg expressed her concerns to Carlson (or someone else responsible for the content of TCT) or that Carlson (or someone else responsible for the content of TCT) was ever made aware of Grossberg's comments.  And it alleges no facts plausibly suggesting that Grossberg was responsible for Carlson's statements or that Grossberg was responsible for generating content, ideas, or scripts for TCT.[9]

### 2.      Donner and Rivera's comments are similarly insufficient

The AC next relies on the statements of Jason Donner, a former Fox News Capitol Hill reporter and producer.  As with Grossberg, the AC cites and incorporates a complaint Donner filed against Fox.  (AC Ex. G.)  In his capacity as a reporter for Fox News, Donner was present at the Capitol on January 6.  (AC ¶ 98.)  According to the AC and Donner's complaint, Donner complained to Fox News' D.C. Bureau Chief about Carlson's "false statements regarding January 6th," such as the "notion that 'January 6th was not orchestrated by President Trump supporters, but instead Trump opponents, which he indicated were Antifa and the FBI' and 'suggest[ing]

---

[9] Epps relies on the AC's allegation that Grossberg "participated in meetings for those individuals responsible for the content of the *Tucker Carlson Tonight* broadcasts[.]"  (AC ¶ 90.) But merely participating in meetings is insufficient, and the AC fails to allege other facts suggesting that Grossberg was responsible for the show's content.

In contending that Grossberg's minimal involvement in TCT's production is sufficient, Epps relies on *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1086 (9th Cir. 2002).  (D.I. 43 at 6.)  *Solano* is inapt.  In *Solano*, the defendant's magazine featured a cover photo of the plaintiff with the headline "PRIMETIME'S SEXY YOUNG STARS EXPOSED."  *Solano*, 292 F.3d at 1080.  The headline falsely implied that the magazine featured nude photographs of the plaintiff when it did not.  *Id.* at 1080–81.  The *Solano* court held that there was at least a genuine dispute of material fact as to whether the defendant acted with actual malice because two staff editors expressed concern that the cover falsely implied that the plaintiff appeared nude inside the magazine.  *Id.* at 1085–87.  In *Solano*, anyone with access to the magazine would have known that the cover statement was false.

January 6th was a "false flag" operation to discredit Trump supporters.'" (AC ¶ 100.) According to Donner, he was told that Carlson was "out of control" but nothing could be done about it. (AC ¶ 101.)

Donner's statements also do not plausibly allege actual malice. Donner's statements don't even mention Epps. The AC alleges no facts plausibly suggesting that Donner had a basis to know whether Epps was a federal informant. Unlike Grossberg, who was at least minimally involved in TCT, there are no facts alleged in the AC or Donner's complaint suggesting that Donner worked on TCT or had any responsibility over the show's content. The AC doesn't allege that Donner ever expressed his concerns to Carlson or anyone else responsible for TCT's content.

The same goes for the allegations regarding former Fox News host Geraldo Rivera. The AC alleges that Rivera claimed that Carlson's statements regarding January 6 were "total bullshit," and alleges on "information and belief" that "given Mr. Carlson's recurring references to Epps as a federal agent who encouraged the violence on January 6th—Mr. Rivera was referring to Mr. Carlson's segments about Epps." (AC ¶ 102.) But even accepting the speculation that Rivera's comment related to Carlson's statements about Epps, the AC nonetheless does not allege that Rivera had information about whether Epps was a federal agent, that Rivera had any involvement in the production of TCT, or that Rivera expressed his concerns to Carlson or anyone responsible for TCT's content before Carlson's statements.

### 3.    The AC's remaining allegations are insufficient

The Court's previous order assessed the remaining allegations pertaining to actual malice. For completeness, I briefly summarize the analysis here.

Epps contends that Carlson relied on Darren Beattie, a discredited source. (AC ¶ 106.) The Court is not persuaded that the AC alleges facts plausibly suggesting that Carlson actually did

21

rely on Beattie as a source.[10]  But even if Beattie were a source, the AC pleads no facts plausibly suggesting that Carlson or those responsible for TCT subjectively believed that Beattie was not credible.  The AC alleges that Beattie was "fired by the Trump administration for his ties to a white supremacist organization" and that his publication "has no apparent investigatory staff or employees."  (AC ¶ 106.)  But for actual malice purposes, the inquiry is not whether a reasonable person would find Beattie to be credible; it's whether Fox subjectively believed that Beattie was not credible.  1 Rodney A. Smolla, *Law of Defamation* § 3:49 (2d ed. 2025) ("[A] reporter may properly rely on one source alone and be free of actual malice, when there is no evidence to support the allegation that the reporter doubted the accuracy of the material supplied by the source."); *id.* § 3:58 (explaining that "[t]here must be subjective doubt in the defendant's mind as to the source's credibility" and that the defendant's reliance on a source may be overcome only "with clear and convincing evidence that the defendant was subjectively aware of a high probability that the source's information was inaccurate").  The AC alleges no facts suggesting that Carlson or others responsible for TCT's content doubted Beattie's credibility.  Nor does it allege facts raising a reasonable inference that Fox should have doubted Beattie's credibility, as "sources need not be paragons of virtue for journalists safely to rely on them." *Talley v. Time, Inc.*, 923 F.3d 878, 903 (10th Cir. 2019) (quoting 1 Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related*

---

[10] During the only challenged segment involving Beattie, Carlson introduces the segment by describing a recent article in the New York Times regarding Epps.  (AC ¶ 55.)  Carlson's discussion of the New York Times piece spans four pages of the show's transcript.  (AC Ex. B at 5–9.)  Carlson then introduces Beattie by stating that Beattie "is one of the reasons this piece was first written" and then asks "[w]hat do you make of this?"  (AC ¶ 55.)  Beattie then gives his opinion on the New York Times article regarding Epps.  Carlson closes the segment by stating "I appreciate your pulling this thread relentlessly, Darren Beattie.  Thank you." (*Id.*)  In context, Beattie was giving his personal opinion about the New York Times article regarding Epps.  And Carlson never states that he relied on Beattie for any of his opinions.

*Problems* § 5:5.2(C) at 5-109 (5th ed. 2017)).  Indeed, "[c]ourts have consistently held that reliance on tainted or troubled sources does not alone establish actual malice."  *Id.* (collecting cases).

Epps next contends that Carlson was motivated to lie about Epps to deflect from Fox's own role in instigating January 6.  (AC ¶ 107.)  But it's well-established that an improper motive is insufficient to show actual malice.  *McCafferty*, 955 F.3d at 360.  Even if Carlson possessed an improper motive, that would not rise to a plausible suggestion that he in fact seriously doubted the truth of his statements.  *See, e.g.*, *Pace*, 850 F. App'x at 832–33; *Lohrenz*, 350 F.3d at 1284 ("Evidence that the publishers of the alleged defamatory statements were on a mission to reinstate the ban against women being assigned to combat positions in the military does not suffice to show actual malice."); *Tavoulareas*, 817 F.2d at 795.

Epps also argues that Carlson's statements were inherently improbable.  (AC ¶ 108.)  The Court cannot reasonably infer that Carlson's suggestion that Epps was an FBI informant was so inherently improbable as to suggest actual malice.  For the most part Carlson disclosed the facts underpinning his statements: Epps was filmed on January 5 urging folks to enter the Capitol the next day, he was recorded speaking with Ryan Samsel moments before Samsel breached the barricade, and, notwithstanding those facts, he was not initially charged with a crime.  What's more, the Department of Justice has since publicly confirmed that numerous FBI confidential human sources were present at the Capitol on January 6, and that many of those sources either entered the Capitol or breached its restricted area.[11]  The Court cannot say that Carlson's

---

[11] In December 2024, the Department of Justice's Office of the Inspector General published a report finding that 3 FBI confidential human sources were tasked with traveling to Washington, D.C. for the events of January 6th to report back on potential domestic terrorism subjects, and that 23 additional FBI confidential human sources were in Washington, D.C. in connection with the events planned for January 6.  U.S. Dep't of Justice, A Review of the Federal Bureau of Investigation's Handling of Its Confidential Human Sources and Intelligence Collection Efforts in

speculation that Epps was an FBI informant was so inherently improbable that it rises to the level of actual malice.

Epps next contends that Carlson's inconsistent statements about Epps demonstrate that Carlson (or Fox) knew they were false or was at least reckless as to whether they were true.  Epps says that Carlson's statements were inconsistent because the surveillance footage shows that "Epps was captured multiple times de-escalating the crowd and negotiating with the police to avoid further clashes."  (AC ¶ 109.)  But Epps does not explain how that renders any of Carlson's statements inconsistent.[12]  The AC also alleges the existence of an inconsistency because, on a January 6, 2022 segment, Carlson stated that another individual was recorded coordinating the crowd into the Capitol, yet on Carlson's March 7, 2023 broadcast Carlson stated that Epps was the only person recorded encouraging people to go into the Capitol that received a glowing profile in the New York Times.  (AC ¶ 111.)  It's not clear that those statements are inconsistent, but even setting that aside, the Court rejects as implausible the inference that Carlson knew his statements were false because of a single comment he made fourteen months earlier about a different person. *See Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 759 (4th Cir. 2023) (rejecting the "tenuous" inference that a speaker in fact entertained serious doubts about his statement because of "a single, brief comment during an hourlong show that covered several different political topics" two weeks

---

the Lead Up to the January 6, 2021 Electoral Certification 4–5 (Dec. 2024), https://perma.cc/5XHF-QWS9.  The Report found that 4 FBI confidential human sources entered the Capitol on January 6 and an additional 13 entered the Capitol restricted area that day.  The Court takes judicial notice of the existence of the report only for the purpose of assessing Epps's argument that it was objectively implausible that he was serving as an FBI source on January 6; the Court does not assume the veracity of the findings in the report.

[12] *See, e.g., Copeland v. Netflix, Inc.*, No. 24-163-SB, 2025 WL 3687742, at *4 (D. Del. Dec. 19, 2025) (rejecting complaint's mere *ipse dixit* that statements were contradictory and dismissing amended complaint for failure to allege actual malice).

24

before the challenged statement).  The Court is not persuaded that the AC plausibly alleges an inconsistency, and even if it did, it is insufficient to plausibly suggest actual malice.

Epps also contends that Fox purposely avoided the truth by refusing to air guests on the show who disagree with Carlson.  (AC ¶ 110.)  But Epps cites no authority suggesting that a broadcaster must publish the statements of people the broadcaster disagrees with or that failing to do so amounts to actual malice.  "The fact that a commentary is one sided and sets forth categorical accusations has no tendency to prove that the publisher believed it to be false."  *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1307 (D.C. Cir. 1996) (quoting *Westmoreland v. CBS, Inc.*, 601 F. Supp. 66, 68 (S.D.N.Y. 1984)).  Indeed, neither the failure to investigate nor an extreme departure from journalistic standards demonstrate actual malice.  *McCafferty*, 955 F.3d at 359 (citations omitted).  The only way Carlson's failure to air guests who disagree with him could possibly suggest actual malice is if the guest would have "confirm[ed] the probable falsity" of Carlson's statements.  *Lemelson*, 903 F.3d at 25–26 (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692–93 (1989)).  The AC pleads no facts plausibly suggesting that's the case.  The AC does not allege any facts plausibly suggesting that Carlson purposefully avoided the truth or that any such avoidance rises to actual malice.[13]

Epps asserts that Fox failed to retract its prior statements.  (AC ¶ 113.)  "[B]ut the lack of a retraction has little to no relevance in the actual malice inquiry."  *Blankenship*, 60 F.4th at 763 (citations omitted).

---

[13] Epps also suggests that Fox purposely avoided the truth by failing to publish portions of the surveillance video showing Epps deescalating the crowd.  But Carlson did publish at least some of that video.  And the Court is not persuaded that Carlson's alleged failure to publish the entire 44,000 hours of surveillance video raises a plausible inference that Carlson knew his statements were false.

Epps also asserts that Fox failed to credit Epps's denials.  (AC ¶¶ 114–15.)  But there is no requirement to publish denials.  *Lohrenz*, 350 F.3d at 1285 (collecting cases); *see also Huckabee v. Time Warner Ent. Co. L.P.*, 19 S.W.3d 413, 427 (Tex. 2000) ("The mere fact that a defamation defendant knows that the public figure has denied harmful allegations or offered an alternative explanation of events is not evidence that the defendant doubted the allegations.").  That's particularly true where, as here, "the denials contain no 'evidence that could be readily verified[.]'" *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 242 (D.C. Cir. 2021) (quoting *Lohrenz*, 350 F.3d at 1285); *see also* Smolla § 3:65.50 ("A denial only serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality.").  Plus, Fox did publish Epps's denial that he was not working for law enforcement.  (AC ¶ 58.)

Finally, Epps contends that even if none of the circumstances above are sufficient alone to plausibly suggest actual malice, when considered collectively, they do rise to a plausible allegation of actual malice.  I disagree.  Taken together, the allegations do not give rise to a plausible inference that Carlson or anyone else responsible for TCT subjectively knew that their statements were false or that they possessed a reckless disregard for the truth.  The statements were not so objectively implausible or internally inconsistent that they cast doubt on Carlson's (or Fox's) state of mind.  Grossberg, Donner, and Rivera were not responsible for the statements and had no way to know whether the statements were false.

### B.    Redacted Podcast

The Court's prior order rejected Epps's claim based on Carlson's March 11, 2023 statements on the third-party *Redacted* podcast for the additional reason that the original Complaint did not plead facts plausibly suggesting that Fox was responsible for those statements.  (D.I. 28;

26

D.I. 48 at 8.)  The AC's new allegation that Carlson had an exclusive employment contract with Fox (AC ¶¶ 24, 65) does not change that conclusion.

## IV.    CONCLUSION

For the reasons above, Defendant Fox News Network, LLC's Motion to Dismiss the Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) for Failure to State a Claim (D.I. 35) will be GRANTED.  An appropriate order will follow.